ALEXANDER ROBERTSON, IV (State Bar No. 127042)
arobertson@arobertsonlaw.com
MARK J. UYENO (State Bar No. 189063)
muyeno@arobertsonlaw.com
ROBERT NATION (State Bar No. 108490)
rnation@arobertsonlaw.com
ROBERTSON & ASSOCIATES, LLP
32121 Lindero Canyon Road, Suite 200
Westlake Village, California 91361
Telephone:(818) 851-3850 • Facsimile: (818) 851-3851

Attorneys for Plaintiffs And The Proposed Class

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG LYZNICK, an individual, on behalf of himself and all others similarly situated; SHARI COLLINS, an individual, on behalf of herself and all others similarly situated; PATRICIA COTTINGTON, an individual, on behalf of herself and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>LUMBER LIQUIDATORS, INC., a Delaware corporation; BUILDING HEALTH CHECK, LLC, a Florida limited liability company; PURE AIR CONTROL SERVICES, INC., a Florida corporation, and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. 2:15-cv-2817<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>1. **Violation of Racketeer Influenced and Corrupt Organizations Act (RICO) [18 U.S.C. §1962(c)];**<br>2. **Violations of the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.);**<br>3. **Violations of the False Advertising Law (Cal. Bus. & Prof. Code § 17500);**<br>4. **Violation of Consumer Legal Remedies Act (Cal. Civ. Code § 1750); and**<br>5. **Fraudulent Concealment;**<br><br>**DEMAND FOR A JURY TRIAL** |

Plaintiffs, CRAIG LYZNICK, SHARI COLLINS and PATRICIA

COTTINGTON, by and through their attorneys, bring this action on behalf of

themselves and all others similarly situated against Defendants LUMBER

LIQUIDATORS, INC. (hereinafter "Lumber Liquidators"), BUILDING HEALTH

CHECK, LLC, and PURE AIR CONTROL SERVICES, INC., collectively referred

1   to herein as "Defendants".  Plaintiffs hereby allege, on information and belief,

2   except as to those allegations that pertain to the named Plaintiffs, which allegations

3   are based on personal knowledge, as follows:

4                           **INTRODUCTION**

5        1.     Since 1988, the State of California has recognized that formaldehyde

6   gas is a chemical known to cause cancer.  By 1992, the California Air Resources

7   Board ("CARB") had formally listed formaldehyde as a chemical with no safe level

8   of human exposure.

9        2.     Certain building materials, including laminate flooring, are processed

10  in a way that introduces formaldehyde into the material during manufacturing.  In

11  response, the CARB has passed regulations limiting the amount of formaldehyde

12  emissions that may be present.  Specifically, the California Code of Regulations,

13  Title 17, (which addresses public health), sections 93120 through 93120.12 are

14  known as the Airborne Toxic Control Measure to Reduce Formaldehyde Emissions

15  from Composite Wood Products ("CARB Regulations").  The regulations apply to

16  anyone who manufacturers, distributes, imports, sells, or supplies the designated

17  materials in California.

18       3.     Lumber Liquidators is a corporation that distributes, markets, and/or

19  sells laminate wood flooring products in California that are subject to 17 California

20  Code of Regulations sections 93120 through 93120.12.  Lumber Liquidators has 37

21  retail stores in the State of California, more than any other state in the country.

22       4.     Lumber Liquidators supervises and controls the manufacturing of its

23  laminate wood flooring that takes place in China.  Laminate wood flooring consists

24  of a core of pressed wood [commonly referred to as medium-duty fiberboard

25  ("MDF")], which is made up of wood particles bonded together with glue or resin, a

26  high quality photographic image of wood, and a scratch resistant coating.  On

27  information and belief, urea-formaldehyde resin is used to bond the wood particles

28  together in the MDF core of laminate flooring.

5.     For at least the last two years, certain laminate wood flooring manufactured in China, and distributed, sold, and/or controlled by Defendant has contained formaldehyde in excess of the levels allowed under the CARB Regulations ("Formaldehyde Flooring").  On information and belief, Plaintiffs allege that Defendant's Formaldehyde Flooring, includes, but may not be limited to, the following products:

  a. 8 mm Bristol County Cherry Laminate Flooring;

  b. 8 mm Dream Home Nirvana French Oak Laminate Flooring;

  c. 8 mm Dream Home Nirvana Royal Mahogany Laminate Flooring;

  d. 12 mm Dream Home Ispiri America's Mission Olive Laminate Flooring;

  e. 12 mm Dream Home Ispiri Chimney Tops Smoked Oak Laminate Flooring;

  f. 12 mm Dream Home Ispiri Poplar Forest Oak Laminate Flooring;

  g. 12 mm Dream Home Kensington Manor Antique Bamboo Laminate Flooring;

  h. 12 mm Dream Home Kensington Manor Cape Doctor Laminate Flooring;

  i. 12 mm Dream Home Kensington Manor Fumed African Ironwood Laminate Flooring;

  j. 12 mm Dream Home Kensington Manor Glacier Peak Poplar Laminate Flooring;

  k. 12 mm Dream Home Kensington Manor Golden Teak Laminate Flooring;

  l. 12 mm Dream Home Kensington Manor Handscraped Imperial Teak Laminate Flooring (SKU 10029601);

ROBERTSON & ASSOCIATES, LLP

17971.1

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1      m.    12 mm Dream Home Kensington Manor Handscraped Imperial

2             Teak Laminate Flooring (SKU 10023958);

3      n.    12 mm Dream Home Kensington Manor Handscraped Summer

4             Retreat Teak Laminate Flooring;

5      o.    12 mm Dream Home Kensington Manor Sandy Hills Hickory

6             Laminate Flooring;

7      p.    12 mm Dream Home Kensington Manor Tanzanian Wedge

8             Laminate Flooring;

9      q.    12 mm Dream Home Kensington Manor Warm Springs Chestnut

10            Laminate Flooring;

11      r.    12 mm Dream Home St. James African Mahogany Laminate

12            Flooring;

13      s.    12 mm Dream Home St. James Blacksburg Barn Board Laminate

14            Flooring;

15      t.    12 mm Dream Home St. James Brazilian Koa Laminate

16            Flooring;

17      u.    12 mm Dream Home St. James Chimney Rock Charcoal

18            Laminate Flooring;

19      v.    12 mm Dream Home St. James Cumberland Mountain Oak

20            Laminate Flooring;

21      w.    12 mm Dream Home St. James Golden Acacia Laminate

22            Flooring;

23      x.    12 mm Dream Home St. James Nantucket Beech Laminate

24            Flooring;

25      y.    12 mm Dream Home St. James Oceanside Plank Bamboo

26            Laminate Flooring;

27      z.    12 mm Dream Home St. James Vintner's Reserve Laminate

28            Flooring; and

1            aa.     15 mm Dream Home St. James Sky Lakes Pine Laminate

2                   Flooring.

3         6.     Lumber Liquidators supervises and/or controls the manufacturing and

4   packaging of Formaldehyde Flooring in China that it then distributes, markets,

5   and/or sells in California.

6         7.     On or about March 1, 2015, the CBS News television show "60

7   Minutes" aired an investigative news story about Lumber Liquidators laminate

8   flooring manufactured in China, which reportedly contained excessive levels of

9   formaldehyde gas emissions that exceeded CARB Regulations.  In response to this

10  news story, Lumber Liquidators began an unprecedented media campaign attacking

11  the credibility of CBS News and the CARB method of testing for compliance with

12  its formaldehyde emissions regulations.  Rather than offering its customers a refund

13  to replace the Formaldehyde Flooring, Lumber Liquidators "doubled-down" and

14  ignored these test results. On the Lumber Liquidators website, Tom Sullivan, CEO,

15  states, "Let me make one thing very clear – our laminate products, all of them, are

16  100% safe."

17  **A.    The Lab Analyzing the Home Test Kits Is Not "Independent"**

18        8.     On or about March 12, 2015, Lumber Liquidators began offering

19  through its website, free Air Quality Test Kits (hereinafter "home test kits") as a

20  media campaign to try and convince its customers that its Formaldehyde Flooring

21  was "safe". Lumber Liquidators explained this strategy on its Health and Safety

22  webpage "as a step for customers with our laminate floors to help reassure them that

23  their floor as installed is safe." Lumber Liquidators further represented to its

24  customers on its website that "The testing is being administered and the results

25  produced by an independent, accredited lab."

26        9.     However, Plaintiffs are informed and believe that the testing company

27  and the laboratory that Lumber Liquidators has hired to analyze the home test kits

28  sent to Lumber Liquidators' customers is not truly independent.  The company hired

ROBERTSON
& ASSOCIATES, LLP

17971.1

5

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   by Lumber Liquidators to provide the free home test kits to its customers is

2   Defendant Building Health Check, LLC.

3       10.   On or about March 12, 2015, Plaintiff Patty Cottington ordered two

4   home test kits from Lumber Liquidator's website.  On or about March 14, 2015,

5   Patty Cottington received an email from Defendant Building Heath Check, LLC

6   informing her that she would be receiving her home test kits in the mail within 1-3

7   days.  However, Cottington did not receive the two test kits until March 21, 2015.

8       11.   The home test kits which Patty Cottington received from Defendant

9   Building Health Check, LLC contained written instructions and packaging, which

10   claimed that the enclosed "Bio-Badge" analyzes "personal exposure" and "room

11   concentration" of formaldehyde.  The instructions further represented to Patty

12   Cottington that the home test kit included "AIHA Accredited Lab Analysis" and was

13   the "Same Sample Screen Used by Professionals."

14       12.   The instructions on the home test kit instructed Patty Cottington to

15   leave the Bio-Badge exposed for 24 hours in the center of the room, at least four feet

16   off the ground.  The instructions further explained to return the Bio-Badge in a zip

17   lock bag, then place the zip lock bag into a Tyvek envelope provided, and then mail

18   the sample to EDLab at 4911 Creekside Drive, Suite C, Clearwater, Florida, 33760.

19   Finally, the instructions indicated that results would be sent to the Plaintiff within 7-

20   10 days after EDLab receives the sample.

21       13.   Plaintiffs Craig Lyznick and Shari Collins were sent  the same Bio-

22   Badge home test kits from Lumber Liquidators with the identical instructions that

23   Patty Cottington received.

24       14.   Defendant Building Heath Check, LLC is a wholly owned subsidiary of

25   Defendant Pure Air Control Services, Inc. Both companies list their business

26   address at 4911 Creekside Drive, Suite C, Clearwater, Florida. EDLab is a division

27   of Defendant Pure Air Control Services, Inc. Plaintiffs were instructed to return their

28   Bio-Badge samples via U.S. Mail to EDLab at 4911 Creekside Drive, Suite C,

ROBERTSON
& ASSOCIATES, LLP

17971.1

6

1  Clearwater, Florida. Thus, Pure Air Control Services, Inc. owns and has a financial

2  interest in the both the testing company hired by Lumber Liquidators and the lab

3  which performs the analysis of the home test kits for Lumber Liquidators.  This

4  practice is contrary to the industry standard where an industrial hygiene company

5  typically collects the indoor air samples and then sends those samples to an

6  independent laboratory for analysis.  This standard practice removes any conflict of

7  interest between the company taking the indoor air samples and the lab reporting

8  and explaining the results.  According to the American Board of Industrial Hygiene

9  Code of Ethics, an industrial hygienist must "disclose to clients or employees

10  significant circumstances that could be construed as a conflict of interest" and

11  "assure that a conflict of interest does not compromise legitimate interests of a

12  client, employer, employee or the public and does not influence or interfere with

13  professional judgment." Neither Lumber Liquidators, Building Health Check, LLC

14  or EDLab disclosed the financial ties and common ownership between the testing

15  company and the lab Hired by Lumber Liquidators to conduct the indoor air

16  sampling in the Plaintiffs' homes.

17        15.    Further evidence that the lab is not "independent" is the fact that

18  EDLab routinely shares the results of the home test kits with Lumber Liquidators, a

19  fact which both Lumber Liquidators and Building Health Check, LLC conceal from

20  Lumber Liquidators' customers who order the home test kits.  On or about that April

21  10, 2015, in response to a direct question from Patty Cottington, Dr. Rajiv Sahay,

22  the lab director for EDLab, told her on a telephone call that "of course" EDLab

23  shares the results of the home test kits with Lumber Liquidators, because he said

24  Lumber Liquidators was EDlab's "client."  This gross breach of confidentiality

25  violates the American Board of Industrial Hygiene's Code of Ethics, which requires

26  industrial hygienists to "maintain and respect the confidentiality of sensitive

27  information obtained in the course of professional activities unless…the

28  client…expressly authorizes the release of specific information…."  At no time did

1  any of the Plaintiffs authorize Defendants Pure Air Control Services, Inc., Building

2  Health Check, LLC. or EDLab to release their indoor air test results to Lumber

3  Liquidators.

4  **B.**     **The Lab Is Not Accredited to Analyze Formaldehyde Gas**

5       16.    On its "Health and Safety" webpage, Lumber Liquidators states, "The

6  testing is being administered and the results produced by an independent, accredited

7  lab." Further, EDLab represents on the home test kits mailed to the Plaintiffs that it

8  will provide "AIHA Accredited Lab Analysis" of the Bio-Badge for formaldehyde.

9  Also, on the lab test report sent to Plaintiff Cottington, EDLab represented that it is

10  an "accredited laboratory" by AIHA LAP, LLC.

11       17.    AIHA LAP is an acronym which stands for the American Industrial

12  Hygiene Association's Laboratory Accreditation Program.  It offers accreditation,

13  based upon proficiency testing, quality control and quality assurance testing, to

14  laboratories in five (5) different categories, including (1) Industrial Hygiene

15  Laboratory Accreditation Program (IHLAP); (2) Environmental Lead Laboratory

16  Accreditation Program (ELLAP); (3) Environmental Microbiology Laboratory

17  Accreditation Program (EMLAP); (4) Food Laboratory Accreditation Program; and

18  (5) Unique Scopes Laboratory Accreditation Program.

19       18.    EDLab is only accredited by AIHA LAP, LLC as an Environmental

20  Microbiology lab.  In other words, EDLab's accreditation is limited to proficiency in

21  testing microbiological (e.g., mold) samples and not chemicals such as

22  formaldehyde. The proper AIHA laboratory accreditation program which qualifies a

23  lab's proficiency in performing chemical analysis, such as formaldehyde gas, is the

24  Industrial Hygiene Laboratory Accreditation Program (IHLAP).  EDLab does not

25  have an IHLAP accreditation.

26       19.    EDLab's representations on the Bio-Badge packaging that it will

27  provide "AIHA Accredited Lab Analysis" on the formaldehyde home test kit

28  violates the AIHA's policy "Reference to Accreditation and Advertising Policy"

1   (hereinafter "AIHA Accreditation Policy").  Specifically, Policy 7.3 of AIHA's

2   Accreditation Policy states, "Any of these references [AIHA LAP Accreditation

3   logos] may not be used or implied for a FOT(s) [Fields of Testing] for which lab is

4   not accredited by AIHA-LAP, LLC."  Further, Policy 7.8 provides, in relevant part:

5       "7.8 **LIMITATIONS TO REFERENCING AIHA-LAP, LLC**

6       **ACCREDITATION**:

7       7.8.2  A statement of AIHA-LAP, LLC accreditation or the AIHA-LAP, LLC

8   accreditation symbol shall only be used by the laboratory on its internet web site,

9   letterhead documents, reports, business cards, brochures or advertising referring to

10   the laboratory only ("communication media").  <u>The laboratory shall not use a</u>

11   <u>statement of AIHA-LAP, LLC accreditation or AIHA-LAP, LLC symbol on</u>

12   <u>communication media when such testing is outside the scope of accreditation, unless</u>

13   <u>the laboratory provides a clear disclaimer and/or identifies the testing that is outside</u>

14   <u>the scope of AIHA-LAP, LLC accreditation.</u>" (emphasis added).

15       20.    EDLab has clearly violated the aforementioned AIHA-LAP, LLC

16   policy by using the "AIHA LAP, LLC Accredited Laboratory" symbol on its lab

17   reports sent to Plaintiffs and the Class when the scope of its accreditation by that

18   organization is limited to environmental microbiology. EDLab is misusing the

19   AIHA-LAP, LLC accreditation symbol to mislead the Plaintiffs and the Class that

20   its lab has been accredited to conduct lab testing on formaldehyde samples, which is

21   outside of the actual field of testing (FOT) for which it has been actually accredited.

22       21.    Further, EDLab has violated AIHA-LAP, LLC's policy regarding the

23   use of the accreditation symbol on its Bio-Badge home test kit product. Specifically,

24   AIHA-LAP, LLC's Policy states:

25       "7.8.3  A statement of AIHA-LAP, LLC accreditation and/or the
    AIHA-LAP, LLC accreditation symbol signifies that a laboratory meets

26       certain standards.  The laboratory shall not displace a statement of
    AIHA-LAP, LLC accreditation or the AIHA-LAP, LLC accreditation

27       symbol on products, product catalogs, product packaging or inserts or
    otherwise on any item not specifically outlined as communication

28       media, above.  Furthermore, a statement of AIHA-LAP, LLC
    accreditation or the AIHA-LAP, LLC accreditation symbol may not be

ROBERTSON
& ASSOCIATES, LLP

17971.1

9

1  displayed on communication media or any other laboratory materials
   that are outside the scope of accreditation for which the laboratory is
2  accredited by the AIHA-LAP, LLC."

3  22.   Pure Air Control Services, Inc, through its division EDLab, has

4  violated this policy by including the "AIHA EMLAP" symbol on its Bio-Badge

5  product shipped to the Plaintiffs and by making the statement "AIHA Accredited

6  Lab Analysis" on the product packaging of the Bio-Badge shipped to the Plaintiffs.

7  23.   Additionally, the AIHA Accreditation Policy 7.8.6 states, "The

8  laboratory shall take care that no report or certificate nor any part thereof

9  referencing AIHA-LAP, LLC accreditation is used in a misleading manner."  Pure

10 Air Control Services, Inc., and its division EDLab, have violated this AIHA

11 Accreditation policy as well.

12 24.   The representations by Defendants that an "accredited" lab is

13 conducting the analysis of formaldehyde gas emissions in Lumber Liquidators'

14 customers' homes is false and misleading. In short, <u>Lumber Liquidators has hired a</u>

15 <u>mold lab to conduct formaldehyde gas emissions testing and is trying to deceive its</u>

16 <u>customers into a false sense of security with the accreditation and proficiency of its</u>

17 <u>chosen lab</u>.

18 **C.**   **The Bio-Badge Falsely Claims It Will Determine "Personal Exposure" to**

19    **Formaldehyde Gas Emissions and Is the Same Sample Screen "Used by**

20    **Professionals"**

21 25.   The instructions on the Bio-Badges which were sent to Plaintiffs claim

22 the badge "analyzes for personal exposure and room concentration."  However, the

23 instructions omit to inform the user that in its advertising on the internet, Building

24 Health Check, LLC advertises that in order to conduct "personal exposure

25 monitoring", the user must clip the badge onto the person (e.g. clothing) "near the

26 breathing zone" and wear the device for 24 hours.  The instructions sent to Plaintiffs

27 instructed Plaintiffs to place the Bio-Badge in the center of a room four feet above

28 the floor.  Thus, the instructions did not explain that this testing method would not

1   test for "personal exposure" as advertised on the Bio-Badge packaging.

2       26.    Second, the Bio-Badge packaging claims it is the "Same Sample Screen

3   Used by Professionals." This statement is false. There are two different types of

4   formaldehyde indoor air sampling strategies used by professional industrial

5   hygienists. The first involves "passive" sampling, which uses a diffusive sampler

6   such as the badge monitor. The Bio-Badge uses a plastic holder containing 2,4

7   dinitrophenylhydrazine (DNPH) as the sample medium. The user is instructed to

8   simply hang the badge in the center of the room approximately four feet above the

9   floor for 24 hours. This is a passive sampler, meaning that no air pump is used to

10  draw a specified volume and rate of air across the medium in a closed cassette. Both

11  OSHA and NIOSH have published test methods to be followed when collecting

12  indoor air samples for formaldehyde using a passive badge monitor. OSHA Method

13  205 specifies the use of a passive badge dosimeter. However, OSHA warns that

14  using this test method has many disadvantages, including (1) the badge may not be

15  capable of accurately determining STEL exposures at or below 3 ppm; (2) the

16  sample rate is dependent upon the face velocity; (3) that the dosimeter badge should

17  not be used in areas where the air velocity is less than 4.6m/min (15ft/min); and (4)

18  reverse diffusion can lower the test results.

19      27.    NIOSH also has published a testing method for the use of a passive

20  badge monitor. NIOSH Method 1007 differs significantly from the Bio-Badge

21  instructions and recommended use. For example, the NIOSH method requires (1)

22  reporting the site atmospheric pressure and temperature; (2) storage of samples both

23  before and after use in a refrigerator; (3) not using the diffusive badge samplers if

24  the humidity is less than 10%; and (4) at humidities lower than 20%, these samplers

25  have lower recoveries. The lower the humidity, the lower the recovery.

26      28.    The second type of sampling strategy is "active" sampling, which

27  involves the collection of air samples using special equipment such as personal

28  sampling pumps which draw a specified volume of air at a specified flow rate into a

1  sealed cartridge, cassette or glass cartridge.  Professional industrial hygienists

2  typically use one of four (4) active sampling methods to test for formaldehyde gas in

3  indoor air.  These four accepted methods are (1) NIOSH Method 2016 (air sampling

4  with cartridge); (2) NIOSH Method 2541 (gas chromatography); (3) NIOSH Method

5  3500 (visible absorption spectrometry); and (4) OSHA Method 52 (air sampling

6  using 37 mm filter cassette).

7      29.     According to OSHA regulations, 29 CFR 1910.1048 Appendix B,

8  entitled "Sampling Strategy and Analytical Methods for Formaldehyde", "exposure

9  data collected on a single day will not automatically guarantee the employer that his

10  or her workplace is always in compliance with the formaldehyde standard."  OSHA

11  recommends taking at least three (3) samples a work shift.  Further, OSHA

12  regulations state, "the person responsible for conducting sampling must be aware of

13  systematic changes which will negate the validity of the sampling results.

14  Systematic changes in formaldehyde exposure concentration for an employee can

15  occur due to: (1) the employee changing patterns of movement in the workplace; (2)

16  closing of doors and windows; (3) changes in ventilation from season to season; (4)

17  decreases in ventilation efficiency.

18      30.     The sampling method used by Building Health Check, LLC involving

19  the Bio-Badge does not follow the NIOSH Method 1007 and fails to take into

20  consideration any of the disadvantages of using a passive badge monitor listed in

21  OSHA Method 205.  Further, the Bio-Badge only captures a snapshot of indoor air,

22  and does not account for the variables listed in OSHA's recommended sampling

23  strategy dealing with occupant patterns of movement, the closing or opening of

24  windows, changes in ventilation from season to season, etc.  Additionally, a

25  professional certified industrial hygienist would design a sampling strategy based

26  upon a number of factors, including (1) the number of samples will vary depending

27  upon the size and floorplan of each home; (2) the sample location above the floor

28  height will vary depending upon if there are small children or pets which occupy the

1  home; (3) the ventilation conditions for each home; (4) the barometric pressure; (5)

2  the temperature; (6) humidity; (7) personal habits such as whether the occupants

3  smoke, burn candles, etc.; (8) whether the home is occupied by sensitive persons,

4  such as infants, elderly, persons with respiratory diseases such as emphysema or

5  COPD, and the immunocompromised.  The Defendants' "one-size-fits-all" approach

6  to using the Bio-Badge is not "the most effective way to measure the total level of

7  formaldehyde in the home" as represented on Lumber Liquidators' Health and

8  Safety webpage, nor is it the "Same Sample Screen Used by Professionals" as

9  represented by Building Health Check, LLC and EDLab on the packaging for the

10  Bio-Badge.  These representations are false and misleading.

11       31.    Plaintiffs bring this class action on behalf of themselves and all others

12  similarly situated, asserting claims under Racketeer Influenced and Corrupt

13  Organization Act, 18 U.S.C. §1962(C), California's Unfair Competition Law, Cal.

14  *Bus. & Prof. Code* § 17200, *et seq.* ("UCL" or "§17200"); the Consumer Legal

15  Remedies Act, *Cal. Civ. Code* § 1750, *et seq.* ("CLRA"); False Advertising in

16  Violation of Cal. *Bus & Prof. Code* § 17500, *et seq.*; and fraudulent concealment.

17  Plaintiffs seek damages and equitable relief on behalf of the Class, which relief

18  includes but is not limited to the following: providing free indoor air testing using

19  one of the four generally accepted active sampling methods, including NIOSH

20  Method 2016, NIOSH Method 2541, NIOSH Method 3500 or OSHA Method 52, of

21  the class members' homes where Formaldehyde Flooring has been installed by a

22  certified industrial hygienist and an independent testing lab accredited by the AIHA

23  LAP Industrial Hygiene Laboratory Accreditation Program (IHLAP); costs and

24  expenses, including attorneys' fees and expert fees; injunctive relief and declaratory

25  relief; and any additional relief that this Court determines to be necessary to provide

26  complete relief to Plaintiffs and the Class.

27  / / /

28  / / /

**PARTIES**

32.    Plaintiff Craig Lyznick is a resident of Santa Clarita, California.

33.    Plaintiff Shari Collins is a resident of San Diego, California.

34.    Plaintiff Patricia Cottington is a resident of North Fork, California.

35.    Plaintiffs purchased Formaldehyde Flooring believing it to be reasonably safe to use for the purpose for which it was intended and requested home test kits from Lumber Liquidators to test the indoor air quality of the rooms where Formaldehyde Flooring was installed in their homes.

36.    Defendant Lumber Liquidators, Inc. is a Delaware corporation with its headquarters and principal place of business in Toano, Virginia.  This defendant conducts substantial business in the State of California and in Los Angeles County.

37.    Defendant Building Health Check, LLC is a Florida limited liability company, with its principal place of business in the State of Florida.  This defendant has conducted substantial business in the State of California by sending home test kits and laboratory results to Plaintiff and other Lumber Liquidators' customers in California for the purpose of sampling their indoor air for formaldehyde gas emissions.

38.    Defendant Pure Air Control Services, Inc. is a Florida corporation, with its principal place of business in the State of Florida.  This defendant has conducted substantial business in the State of California by sending home test kits and laboratory results to Plaintiff and other Lumber Liquidators' customers in California for the purpose of sampling their indoor air for formaldehyde gas emissions.

**JURISDICTION AND VENUE**

39.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) ("CAFA"), in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the Class are citizens of a state different from the Defendants.

40.     This Court has personal jurisdiction over the parties in this action by the fact that Defendants are corporations that are authorized to conduct business in California and have intentionally availed themselves of the laws and markets of California through the promotion, marketing, distribution and sale of its laminate wood flooring products and the home test kits.  Each named Plaintiff purchased their Formaldehyde Flooring in California and ordered a home test kit from Lumber Liquidators to test the indoor air of their homes for the presence of formaldehyde gas emissions.

41.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Venue is also proper under 18 U.S.C. §1965(a), because Defendants transact a substantial amount of their business in this District.  Plaintiffs are filing concurrently herewith an affidavit stating facts showing that this action has been commenced in a proper county pursuant to California *Civil Code* section 1780(c).

## FACTUAL ALLEGATIONS

42.     On or about August 9, 2014, Plaintiff Patricia Cottington purchased Kensington Manor Warm Springs Chestnut 12mm laminate flooring from the Lumber Liquidators' store located at 2955 S. Orange, Fresno, California for a purchase price of $1,440. The label on the packaging read, inter alia, "CARB No. SCS-CARB-000090, California 93120 Phase 2 Compliant for Formaldehyde."

43.     After the dangerous formaldehyde levels in Lumber Liquidators' products was featured on the CBS News program "60 Minutes," Lumber Liquidators responded by posting a message from its Chairman on its website stating:

"Let me make one thing very clear – our laminate products, all of our products, are 100% safe."

44.     Lumber Liquidators also posts on its website that it will provide free

1  indoor air test kits to "qualifying customers." Specifically, the website states:

> "To reassure our customers, we are providing indoor air quality testing at no cost to qualifying customers as the fastest, most effective way to measure the total level of formaldehyde in the home. The testing is being administered and the results produced by an independent, accredited lab. The customer is in control of the process, with clear instructions on the test and its results. We will conduct an in-depth evaluation of air quality and potential formaldehyde sources for any customer whose results are inconclusive or above established thresholds. Our customer care team will work with our valued customers throughout the process.
>
> The home test kits are being provided as a step for customers with our laminate floors to help reassure them that their floor as installed is safe. Please fill out the form found at the link below to determine if your floor qualifies for the free test kit. If your floor does qualify, you will be walked through the process of ordering the test via an independent lab."

45.    On information and belief, at all times relevant to this action, Defendants have knowingly misrepresented that the lab which analyzes the home test kits is "independent" and holds the proper "accreditation" to perform analysis of formaldehyde gas emissions.

46.    Plaintiffs did not discover, nor would a reasonable consumer have had reason to suspect that Defendants knowingly misrepresented the accreditation of EDLab, the fact that the home test kit does not follow any of the four generally accepted testing methods in the industrial hygiene industry, or that EDLab is not truly independent, but has common ownership with Building Health Check, LLC, the company which Lumber Liquidators has hired to test its customers' homes for formaldehyde gas emissions.

47.    Plaintiffs have suffered injury in fact and loss of money or property because Lumber Liquidators has not provided full restitution and disgorgement of all ill-gotten monies either acquired or retained by Defendant as a result thereof, thereby depriving Plaintiffs and the Class of laminate wood flooring that does not have an unreasonable risk of harm for personal injury.

48.    Following the "60 Minutes" broadcast on March 1, 2015, Plaintiff Patty Cottington became concerned whether the flooring she purchased from

1 | Lumber Liquidators complied with the CARB Regulations as advertised by Lumber
2 | Liquidators.  According to lab tests commissioned by "60 Minutes", Ms.
3 | Cottington's laminate flooring, Kensington Manor Warm Springs Chesnut 12 mm,
4 | has a concentration of 1.473 ppm using the CARB test method . Based upon these
5 | concerns, Ms. Cottington requested two home test kits on or about March 12, 2015
6 | by filling out a form on Lumber Liquidators' Health and Safety webpage.  On or
7 | about March 21, 2015, two home test kits were mailed to Ms. Cottington by
8 | Building Health Check, LLC, located in Clearwater, Florida.  On March 23, 2015,
9 | Ms. Cottington mailed two Bio-Badge samples back to EDLab in Clearwater,
10 | Florida.  On April 1, 2015, Ms. Cottington ordered two more home test kits by
11 | filling out a form on Lumber Liquidators' Health and Safety webpage.  Additionally,
12 | Ms. Cottington communicated via the internet with both Lumber Liquidators and
13 | EDLab on numerous occasions concerning the samples and test results.  For
14 | example, on or about April 8, 2015, Ms. Cottington emailed Cynthia Bailey at
15 | Building Health Check, LLC asking about the status of her two Bio-Badge samples
16 | that Ms. Cottington mailed to the lab on March 23, 2015.  On that same day, Ms.
17 | Bailey replied to Ms. Cottington via email that the lab had no record of ever
18 | receiving Ms. Cottington 's samples, and that the lab had been inundated with
19 | "thousands of samples due to the Lumber Liquidators' story."  However, the very
20 | next day on April 9, 2015, EDLab emailed Ms. Cottington the lab test results, but
21 | the lab report mistakenly identified the rooms and locations where those two
22 | samples were taken, despite the fact that the correct locations were listed by Ms.
23 | Cottington on the chain-of-custody form she submitted to the lab. Ms. Cottington
24 | immediately sent another email to Cynthia Bailey at Building Health Check, LLC
25 | complaining of the inaccuracies in the lab report. On April 10, 2015, Ms. Cottington
26 | received a revised lab report by email from Building Health Check, LLC, which
27 | corrected the wrong locations where Ms. Cottington had collected her samples.  The
28 | lab report which Ms. Cottington received from EDLab reported a result of 0.038

1  ppm for badge # LLGA9747 and explained that any results which exceed 0.081 ppm

2  warrant a re-test or further evaluation.  The lab report further referenced the World

3  Health Organization guideline of "0.081 ppm") as protective against sensory

4  irritation and long-term health effects.  However, the lab report failed to publish

5  health-based risk levels.  For example, the Agency for Toxic Substances and

6  Disease Registry (ATSDR) has published a "minimum risk level" for chronic

7  exposure to formaldehyde of 0.008 ppm.  The California Office of Environmental

8  Health Hazard Assessment (OEHHA) has recommended that formaldehyde levels

9  not exceed 0.002 for chronic exposure.  Finally, the EPA has stated that

10 formaldehyde concentrations in indoor air should not exceed 0.008 ppm in order to

11 minimize cancer risk.   None of these lower threshold levels were included in the lab

12 report from EDLab sent to Ms. Cottington.  Ms. Cottington's lab test results from

13 EDLab exceeded ATSDR, OEHHA and the EPA's recommended exposure levels.

14     49.     Plaintiff Craig Lyznick purchased Kensington Manor Golden Teak

15 12mm laminate flooring from Lumber Liquidator's store in Santa Clarita on or about

16 December 22, 2014 and July 15, 2014.  The label on the packaging claimed the

17 flooring was CARB Phase 2 Compliant. According to lab tests commissioned by

18 "60 Minutes", the test results for this flooring was 0.404 ppm, which exceeds the

19 CARB Regulations of 0.11 ppm.  As a result, on or about March 13, 2015, Mr.

20 Lyznick hired an industrial hygiene company to test the indoor air in his home for

21 formaldehyde gas.  On or about March 20, 2015, Mr. Lyznick received the results of

22 that testing, which showed an "elevated" concentration of 46 ppb and 41 ppb,

23 respectively in the two room where he had installed the Formaldehyde Flooring. On

24 March 26, 2015, Mr. Lyznick notified both the Lumber Liquidator's store where he

25 purchased the Formaldehyde Flooring and Lumber Liquidator's corporate office of

26 the results of this testing and demanded that the Formaldehyde Flooring be removed

27 immediately.  On or about March 26, 2015, Mr. Lyznick received an email from

28 "Misty" at Lumber Liquidator's corporate office instructing him to send his test

17971.1

18

1 results to LLCustomerRelations@Lumberliquidators.com.  Misty's email further

2 instructed Mr. Lyznick to retest his indoor air using Lumber Liquidator's home test

3 kit and submit that test for analysis "and we will review your test results as soon as

4 we receive them."

5      50.     Plaintiff Shari Collins purchased Kensington Manor Dream Home

6 Summer Retreat Teak 12mm from Lumber Liquidator's San Diego store on or about

7 November 11, 2014.  Shari Collins is a senior citizen, who underwent a kidney

8 transplant in 1994 and is immunocompromised.  According to the lab results

9 commissioned by "60 Minutes", this laminate flooring tested at 0.827 ppm using the

10 CARB testing method.  On or about March 27, 2015, Ms. Collins hired an industrial

11 hygiene company to conduct indoor air sampling of the rooms where she had the

12 Formaldehyde Flooring installed.  The results of that test revealed formaldehyde gas

13 emissions between 0.13 ppm up to 0.42 ppm.  Air sampling at the floor level

14 revealed a result of 1.00 ppm and air sampling of laminate planks in an unopened

15 package from Lumber Liquidators revealed a result of 5.01 ppm.  On or about April

16 6, 2015, Lumber Liquidators sent Ms. Collins two home test kits.  Ms. Collins

17 followed the instructions, returned the samples to EDLab and is awaiting the results.

18      51.     By using a sampling method not generally accepted in the industrial

19 hygiene industry and having those samples analyzed by a laboratory not accredited

20 to conduct chemical analysis, and providing Plaintiffs with lab reports which state

21 that the formaldehyde gas emissions are below any level of concern, and ignoring

22 the results of independent indoor air testing performed on the Plaintiffs' homes,

23 Defendants intended to deceive Plaintiffs into believing that their Formaldehyde

24 Flooring was "100% safe" and intended to cause Plaintiffs to refrain from pursuing

25 their legal rights to obtain a refund of their purchase of the Formaldehyde Flooring.

26 **CLASS ALLEGATIONS**

27      52.     This action may properly be maintained as a class action pursuant to

28 Federal Rules of Civil Procedure Rule 23.  The Class is sufficiently numerous, since

ROBERTSON
& ASSOCIATES, LLP

17971.1

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   it is estimated to include tens of thousands of consumers throughout California, the

2   joinder of whom in one action is impracticable, and the disposition of whose claims

3   in a class action will provide substantial benefits to the parties and the Court.

4        53.   **Class Definition**: Without prejudice to later revisions, the Class which

5   Plaintiffs seek to represent is composed of: all consumers who purchased

6   Formaldehyde Flooring from the time of their introduction in the marketplace

7   through and including the date of class notice, who requested home test kits from

8   Lumber Liquidators and were sent the Bio-Badges by Building Heath Check, LLC

9   which samples were then analyzed by EDLab, a division of Pure Air Control

10   Services, Inc. (the "Class"). Excluded from the Class are Defendants, their

11   affiliates, employees, officers and directors, persons or entities that distribute or sell

12   Formaldehyde Flooring, the Judge(s) assigned to this case, and the attorneys of

13   record in this case.

14        54.   Throughout discovery in this litigation, Plaintiffs may find it

15   appropriate and/or necessary to amend the definition of the Class. Plaintiffs reserve

16   the right to amend the Class definitions if discovery and further investigation reveal

17   that the Class should be expanded or otherwise modified.

18        55.   **Ascertainable Class**: While Plaintiffs do not know the exact number

19   and identity of all class members, Plaintiffs are informed and believe that there are

20   tens, if not hundreds, of thousands of class members. The precise number of

21   members can be ascertained through discovery, which will include Defendants'

22   sales, service and other business records.

23        56.   **Common Questions of Law and Fact Predominate**: There is a well-

24   defined community of interest among the Class. The questions of law and fact

25   common to the Class predominate over questions that may affect individual Class

26   Members. These questions of law and fact include, but are not limited to, the

27   following:

28        aa.   Whether EDLab is accredited by the AIHA to conduct laboratory

1    testing of indoor air samples for formaldehyde gas emissions;

2    bb.   Whether the Bio-Badge method of sampling is the "Same
3          Sample Screen Used by Professionals";

4    cc.   Whether EDLab is an "independent" lab;

5    dd.   Whether using the Bio-Badge and placing it in the center of a
6          room at four feet above the floor measures "personal exposure"
7          to formaldehyde gas;

8    ee.   Whether EDLab's analysis of the Bio-Badge provides "AIHA
9          Accredited Lab Analysis";

10   ff.   Whether Lumber Liquidators' representation that the Air Quality
11         Test Kits would be analyzed by "an independent, accredited lab"
12         was true;

13   gg.   Whether Lumber Liquidators' representation that the Air Quality
14         Test Kits are the "fastest, most effective way to measure the total
15         level of formaldehyde in the home" was true;

16   hh.   Whether Pure Air Control Services, Inc. shares the lab results of
17         the Air Quality Test Kits with Lumber Liquidators;

18   ii.   Whether Lumber Liquidators, Pure Air Control Services, Inc.
19         and Building Health Check, LLC participated in an "enterprise",
20         which through a pattern of racketeering activity consisting of
21         repeated use of the mail and wires, executed a scheme to defraud
22         the Class Members regarding the testing and reporting test
23         results for formaldehyde gas emission in the Class Members'
24         homes due to exposure to Formaldehyde Flooring;

25   jj.   Whether Defendants knew that the Bio-Badge testing was, and
26         is, not a proper test method to detect formaldehyde gas in indoor
27         air;

28   kk.   Whether Defendants omitted and concealed material facts from

ROBERTSON
& ASSOCIATES, LLP   17971.1                    21
                    CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

their communications and disclosures to Plaintiffs regarding the accreditation, or lack thereof, of EdLab to conduct lab analysis of formaldehyde gas emissions from indoor air samples;

ll.   Whether Defendants have violated the UCL;

mm.   Whether Defendants have violated the CLRA;

nn.   Whether Defendants have received funds from Plaintiffs and Class Members that they unjustly received;

oo.   Whether Plaintiffs and proposed Class Members have been harmed and the proper measure of relief;

pp.   Whether Plaintiffs and proposed Class Members are entitled to an award of treble damages, punitive damages, attorneys' fees and expenses against Defendants; and

qq.   Whether, as a result of Defendants' misconduct, Plaintiffs are entitled to equitable relief, and if so, the nature of such relief.

57.   **Numerosity**:  The Class is so numerous that the individual joinder of all members of the Class is impractical under the circumstances of this case.  While the exact number of members of the Class is unknown to Plaintiffs at this time, Plaintiffs are informed and believe the Class consists of thousands of persons. Individual joinder of Members of the Class is also impracticable because the individual Members are dispersed throughout California.

58.   **Typicality**:  Plaintiffs' claims are typical of the claims of the members of the proposed class.  Plaintiffs and all class members have been injured by the same wrongful practices of Defendants.  Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all class members and are based on the same legal theories.

59.   **Adequacy**:  Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class.  Plaintiffs seek no

1  relief that is antagonistic or adverse to the members of the Class and the

2  infringement of the rights and the damages they have suffered are typical of all other

3  Class Members.  Plaintiffs have retained attorneys experienced in consumer class

4  actions and complex litigation as counsel.

5     60.    **Superiority**:  The disposition of Plaintiffs and proposed Class

6  Members' claims in a class action will provide substantial benefits to both the

7  parties and the Court.  The nature of this action and the nature of laws available to

8  Plaintiffs and the Class make the use of the class action device a particularly

9  efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the

10  wrongs alleged because:

11     rr.    The individual amounts of damages involved, while not

12         insubstantial, are such that individual actions or other individual

13         remedies are impracticable and litigating individual actions

14         would be too costly;

15     ss.    If each Class Member was required to file an individual lawsuit,

16         the Defendants would necessarily gain an unconscionable

17         advantage since they would be able to exploit and overwhelm the

18         limited resources of each individual Class Member with vastly

19         superior financial and legal resources;

20     tt.    The costs of individual suits could unreasonably consume the

21         amounts that would be recovered;

22     uu.    Given the size of individual proposed Class Members' claims and

23         the expense of litigating those claims, few, if any, proposed

24         Class Members could afford to or would seek legal redress

25         individually for the wrongs Defendants committed against them

26         and absent proposed Class Members have no substantial interest

27         in individually controlling the prosecution of individual actions;

28     vv.    This action will promote an orderly and expeditious

ROBERTSON
& ASSOCIATES, LLP

17971.1

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1     administration and adjudication of the proposed class claims,

2     economies of time, effort and resources will be fostered and

3     uniformity of decisions will be insured;

4     ww.   Without a class action, proposed Class Members will continue to

5     suffer damages, and Defendants' violations of law will proceed

6     without remedy while Defendants continue to reap and retain the

7     substantial proceeds of their wrongful conduct.

8     xx.   Plaintiffs know of no difficulty that will be encountered in the

9     management of this litigation that would preclude its

10    maintenance as a class action;

11    yy.   Proof of a common business practice or factual pattern which

12    Plaintiffs experienced is representative of that experienced by the

13    Class and will establish the right of each member of the Class to

14    recover on the causes of action alleged; and

15    zz.   Individual actions would create a risk of inconsistent results and

16    would be unnecessary and duplicative of this litigation.

17    61.    Plaintiffs and Class Members have all similarly suffered irreparable

18    harm and damages as a result of Defendants' unlawful and wrongful conduct.  This

19    action will provide substantial benefits to Plaintiffs, the Class and the public

20    because, absent this action, Plaintiffs and Class Members will continue to suffer

21    losses, thereby allowing Defendants' violations of law to proceed without remedy

22    and allowing Defendants to retain proceeds of its ill-gotten gains.

23    **FIRST CAUSE OF ACTION**

24    **Violation of Racketeer Influenced and Corrupt Organizations Act,**

25    **18 U.S.C. §1962 (C) Against All Defendants**

26    62.    Plaintiffs and the Class incorporate by reference each and every

27    preceding paragraph of this Complaint as if fully set forth herein.

28    63.    From at least March 1, 2015 until the present, the affiliation between

1  Lumber Liquidators, Pure Air Control Services, Inc., and Building Heath Check,

2  LLC constituted an enterprise.  Defendants conducted and participated in that

3  enterprise's affairs through a pattern of racketeering activity consisting of numerous

4  and repeated uses of the interstate mails and wire communications to execute a

5  scheme to defraud, all in violation of the Racketeer Influenced and Corrupt

6  Organizations Act ("RICO"), 18 U.S.C. §1962(C).

7      64.    The RICO enterprise, which engaged in, and whose activities affected

8  interstate commerce, was comprised of an association-in-fact of entities and

9  individuals, that included Lumber Liquidators, Pure Air Control Services, Inc.,

10  Building Health Check, LLC, along with several of their officers and directors,

11  including Tom Sullivan, CEO of Lumber Liquidators, Alan Wozniak, CEO of Pure

12  Air Control Services and managing member of Building Health Check, LLC, and

13  Rajiv Saha, Ph.D., lab manager of EDLab.

14      65.    The members of the RICO enterprise all had a common purpose:  to

15  conceal the true concentrations of formaldehyde gas emissions from the

16  Formaldehyde Flooring installed in the Class Members' homes through the use of

17  passive "Bio-badges" which do not conform to sampling methods recognized by

18  NIOSH or OSHA and to have those samples analyzed at a laboratory which was not

19  accredited by AIHA-LAP, LLC to analyze samples for formaldehyde gas.  The

20  further purpose of the enterprise was to deceive the Class Members into believing

21  that the formaldehyde gas emissions from the Formaldehyde Flooring was "100%

22  safe" and not in excess of CARB Regulations and/or health-based minimum risk

23  levels published by the U.S. EPA, ATSDR, and OEHHA.

24      66.    Since this RICO enterprise was formed on or about March 1, 2015, the

25  Defendants have routinely violated the federal mail and wire fraud statutes by

26  communicating with the Plaintiffs and Class Members through emails, by the U.S.

27  Mail and by telephone calls.  Defendants engaged in a scheme or artifice to defraud

28  Lumber Liquidators' customers who requested home test kits by representing to

1  them that the "Bio-Badge" test method was the "Same Sample Screen Used by

2  Professionals" and that the Bio-Badge results undergo "AIHA Accredited Lab

3  Analysis." However, the "Bio-Badge" does not follow accepted sampling protocol

4  published by NIOSH or OSHA. Further, EDLab does not hold the proper

5  accreditation by the AIHA to conduct laboratory testing of formaldehyde gas

6  samples. The Defendants falsely held themselves out to Plaintiffs and the Class

7  Members via the internet, mail, and the telephone as "accredited", "independent"

8  and that the Bio-Badge was the same type of sampling method used by

9  "professionals". These misrepresentations were intended to mislead Plaintiff and

10  the Class Members so that they would believe the Formaldehyde Flooring was

11  "100% safe" when it is not.

12       67.    According to emails sent by EDLab to Plaintiff Cottington, the

13  Defendants have received "thousands" of samples from Lumber Liquidators'

14  customers, all of whom requested these home test kits because they are worried

15  about potentially excessive levels of formaldehyde gas emissions in their homes as a

16  result of purchasing Formaldehyde Flooring. These thousands of violations

17  constitute a pattern of racketeering. They are related in that they share the same

18  purpose of defrauding Lumber Liquidators' customers, involve the same

19  participants, victims and methods of communications. And because of Defendants'

20  large-scale publicity campaign to promote the free home test kits are continuing

21  unabated, they amount to or pose a threat of continued criminal activity.

22       68.    Each of the Defendants associated with the RICO enterprise knew of

23  the existence of the enterprise and its related activities. Lumber Liquidators,

24  through its officers and directors, devised the Air Quality Test Kit campaign and

25  advertised it on its website. Alan Wozniak, the CEO of Pure Air Control Services,

26  Inc. and managing member of Building Health Check, LLC, devised the Bio-Badge

27  sampling protocol and knew that his lab, EDLab, did not hold the proper

28  accreditation from the AIHA to perform laboratory analysis on chemicals such as

1   formaldehyde gas. The Defendants and their officers conducted and participated in

2   the affairs of the RICO enterprise through a pattern of racketeering activity.  Each of

3   the Defendants participated in the enterprise's decision-making or were plainly

4   integral to carrying out the scheme to defraud.

5        69.    As part of their participation, Defendants knowingly and intentionally

6   sent, mailed and transmitted or caused to be transmitted fraudulent statements to

7   Plaintiffs and the Class Members in interstate commerce.  These fraudulent

8   statements constituted numerous and repeated violations of the federal mail and wire

9   fraud statutes in violation of 18 U.S.C. §§1341, 1343, as well as a pattern of

10  racketeering activity in violation of 18 U.S.C. §1962(c).  Defendants knew, or at a

11  minimum were reckless in not knowing that the representations contained in their

12  mail and wire communications to Plaintiffs were misleading, deceptive, and/or false

13  when sent, as a result of the actions of their officers and employees who were acting

14  in the course and scope of their employment by Defendants.

15       70.    By reason of their conduct and participation in the racketeering activity,

16  Defendants caused damages to Plaintiffs and to members of the Class because

17  Defendants have not agreed to refund the purchase price of the Formaldehyde

18  Flooring, thereby depriving Plaintiffs and the Class of laminate wood flooring that

19  does not have an unreasonable risk of harm for personal injury.

20                       **SECOND CAUSE OF ACTION**

21  **Violations of the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200,**

22                    **et seq.) Against All Defendants**

23       71.    Plaintiffs and the Class incorporate by reference each and every

24  preceding paragraph of this Complaint as if fully set forth herein.

25       72.    The acts, omissions, and practices of Defendants as alleged herein

26  constituted, and continue to constitute, unlawful and unfair business acts and

27  practices within the meaning of Section 17200, et seq. of the California *Business &*

28  *Professions Code*.  Plaintiff have standing to bring this action under *Business &*

1 *Professions Code* § 17200 because they have suffered injury in fact and has lost

2 money because of the Defendants' conduct.

3     73.   Defendants have engaged in "unlawful" business acts and practices by

4 their violation of the statutes and regulations, referenced above, including, but not

5 limited to: California *Business & Professions Code* section 17200, *et seq.*;

6 California *Business & Professions Code* section 17500, *et seq.*; California *Civil*

7 *Code* section 1750, *et seq.*; and California common law that prohibits fraudulent

8 concealment and breaches of implied warranty.

9     74.   Defendants have also engaged in "unfair" business acts or practices in

10 that the harm caused by Defendants' scheme to provide bogus home test kits to

11 measure the indoor air quality of Plaintiffs' homes, and have those indoor air

12 samples analyzed by a laboratory which lacks the proper accreditation outweighs the

13 utility of such conduct and the conduct offends public policy, is immoral,

14 unscrupulous, unethical, deceitful and offensive, causes substantial injury to

15 Plaintiffs and the Class, and provides Defendants with an unfair competitive

16 advantage over those companies that abide by the law.

17     75.   Defendants' actions described herein constitute fraud within the

18 meaning of California *Business and Professions Code* section 17200, et seq. in that

19 Defendants have failed to disclose (1) that the "Bio-Badge" is not a generally

20 accepted method to test indoor air for excessive concentrations of formaldehyde gas;

21 (2) that EDLab does not hold the required accreditation to analyze formaldehyde gas

22 samples; and (3) that EDLab is not an "independent" lab.

23     76.   As a result of the conduct described above, Defendants have been and

24 will be unjustly enriched at the expense of Plaintiffs and the Class.

25     77.   The aforementioned unlawful or unfair business acts or practices

26 conducted by Defendants have been committed in the past and continue to this day.

27 Defendants have failed to acknowledge the wrongful nature of their actions.

28 Defendants have not corrected or publicly issued individual and comprehensive

1  corrective notices to Plaintiffs and the Class or provided full restitution and

2  disgorgement of all ill-gotten monies either acquired or retained by Defendant as a

3  result thereof, thereby depriving Plaintiffs and the Class of laminate wood flooring

4  that does not have an unreasonable risk of harm for personal injury.

5    78.    Pursuant to the *Business & Professions Code* section 17203, Plaintiffs

6  and the Class seek an order of this Court requiring Defendants to disgorge all ill-

7  gotten gains and award Plaintiffs and the Class full restitution of all monies

8  wrongfully acquired by Defendants by means of such "unlawful" and "unfair"

9  conduct, plus interest and attorneys' fees pursuant to, inter alia, California *Code of*

10  *Civil Procedure* section 1021.5, so as to restore any and all monies to Plaintiffs and

11  the Class and the general public, which were acquired and obtained by means of

12  such "unlawful" and "unfair" conduct, and which ill-gotten gains are still retained

13  by Defendants.  Plaintiffs and the Class additionally request that such funds be

14  impounded by the Court or that an asset freeze or constructive trust be imposed

15  upon such monies by Defendants.  Plaintiffs and the Class may be irreparably

16  harmed and/or denied and effective and complete remedy if such an order is not

17  granted.

## THIRD CAUSE OF ACTION

### Violations of the False Advertising Law (Cal. Bus. & Prof. Code § 17500)

### Against All Defendants

21    79.    Plaintiffs and the Class incorporate by reference each and every

22  preceding paragraph of this Complaint as if fully set forth herein.

23    80.    California *Business & Professions Code* section 17500 prohibits

24  various deceptive practices in connection with the dissemination in any manner of

25  representations that are likely to deceive members of the public to purchase products

26  such as the Formaldehyde Flooring.  Defendant Lumber Liquidators caused the

27  statement that "the testing is being administered and the results produced by an

28  independent, accredited lab" and that the home test kits "are the fasted, most

1  effective way to measure the total level of formaldehyde in the home" to be placed

2  on its Health and Safety webpage.  Defendant Building Health Check, LLC caused

3  the statements that the Bio-Badge is "Same Sample Screen Used by Professionals"

4  and includes "AIHA Accredited Lab Analysis" to appear on the written instructions

5  and packaging for the home test kits mailed to Plaintiffs and the Class.  Defendant

6  Pure Air Control Services, Inc. caused the statement that EDLab is an "accredited

7  laboratory" to be appear on the laboratory report sent to Plaintiffs by EDLab.

8      81.    As a result of the foregoing, Plaintiffs, and other Class members, and

9  consumers are entitled to injunctive and equitable relief and damages in an amount

10  to be proven at trial.

11  **FOURTH CAUSE OF ACTION**

12  **Violation of Consumer Legal Remedies Act (Cal. Civ. Code § 1750)**

13  **Against All Defendants**

14      82.    Plaintiffs and the Class incorporate by reference each and every

15  preceding paragraph of this Complaint as if fully set forth herein.

16      83.    This cause of action arises under the Consumers Legal Remedies Act

17  ("CLRA"), Cal. *Civ. Code* § 1750, *et seq.*  Plaintiffs are consumers as defined by

18  California *Civil Code* section 1761(d).  Lumber Liquidator's Formaldehyde Flooring

19  constitutes "goods" as defined by California *Civil Code* section 1761(a).  At all

20  times relevant hereto, Defendants constituted a "person" as that term is defined in

21  California *Civil Code* section 1761(a), and Plaintiffs' and class members' purchases

22  of Formaldehyde Flooring constituted "transactions," as that term is defined in

23  California *Civil Code* section 1761(b).

24      84.    Defendants violated and continue to violate the CLRA by engaging in

25  the following deceptive practices specifically proscribed by California *Civil Code*

26  section 1770(a), in transactions with Plaintiffs and class members that were intended

27  to result or which resulted in the sale or lease of goods or services to consumers:

28      aaa.    In violation of California Civil Code section 1770(a)(5),

1    Defendants' acts and practices constitute misrepresentations that

2    the Bio-Badge and associated laboratory testing in question has

3    characteristics, benefits or uses which they do not have;

4    bbb.    In violation of California Civil Code section § 1770(a)(7),

5    Defendants have misrepresented that the home air test kits in

6    question are of particular standard, quality and/or grade, when

7    they are of another.

8    85.    Defendant Lumber Liquidators has made uniform representations on its

9    Health and Safety webpage that the Air Quality Test Kits are "the most effective

10    way to measure total level of formaldehyde in the home" and that "the testing is

11    being administered and the results produced by an independent, accredited lab."

12    Defendant Building Health Check, LLC made the uniform representation on its

13    home test kit packaging that the Bio-Badge is the "Same Sample Screen Used by

14    Professionals" and includes "AIHA Accredited Lab Analysis."  Defendant Pure Air

15    Control Services, Inc. made the uniform representation that EDLab is an "accredited

16    laboratory" on the laboratory reports sent to Plaintiff and to the Class by EDLab.

17    These representations, as set forth above, were false, deceptive, and/or misleading

18    and in violation of the CLRA.

19    86.    Pursuant to California *Civil Code* section 1782, Plaintiffs will notify

20    Defendants in writing by certified mail of the particular violations of California

21    *Civil Code* section 1770 alleged herein, and will demand that Defendants rectify the

22    problems associated with the actions detailed above and give notice to all affected

23    consumers of its intent to so act.  Plaintiffs will send this notice by certified mail,

24    return receipt requested, to Defendants' principal place of business.

25    87.    If Defendants fail to rectify or agree to rectify the problems associated

26    with the actions detailed above and give notice to all affected consumers within 30

27    days after receipt of the California *Civil Code* section 1782 notice, Plaintiffs will

28    seek actual damages and punitive damages for violation of the Act.  In addition,

1  pursuant to California *Civil Code* section 1780(a)(2), Plaintiffs will be entitled to,

2  and therefore seek, a Court order enjoining the above-described wrongful acts and

3  practices that violate California *Civil Code* section 1770.

4       88.    Plaintiffs and the Class will also be entitled to recover attorneys' fees,

5  costs, expenses and disbursements pursuant to California *Civil Code* sections 1780

6  and 1781.

### FIFTH CAUSE OF ACTION

7

**Fraudulent Concealment Against All Defendants**

8

9       89.    Plaintiffs and the Class incorporate by reference each and every

10  preceding paragraph of this Complaint as if fully set forth herein.

11       90.    Defendant Lumber Liquidators advertised and/or represented on its

12  website that its Formaldehyde Flooring was "100% safe" and in furtherance of that

13  representation, offered free home test kits to its customers, including Plaintiffs, in

14  order to convince them that there were not excessive levels of formaldehyde gas

15  emissions caused by the Formaldehyde Flooring.  Lumber Liquidators represented

16  on its Health and Safety webpage that the indoor air quality testing was the "fastest,

17  most effective way to measure the total level of formaldehyde in the home" and that

18  the "testing is being administered and the results produced by an independent,

19  accredited lab."

20       91.    In furtherance of Lumber Liquidators campaign to convince Plaintiffs

21  and the Class that the Formaldehyde Flooring was "100% safe", Lumber Liquidators

22  retained Building Health Check, LLC to send home test kits to Plaintiffs and the

23  Class to test the air inside their homes for formaldehyde gas emissions.  Building

24  Health Check, LLC represented to Plaintiffs and the Class on the instructions and

25  packaging of the Bio-Badge that it was the "Same Sample Screen Used by

26  Professionals", would include "AIHA Accredited Lab Analysis" and would measure

27  "personal exposure" to formaldehyde.  Further, Pure Air Control Services, Inc.

28  represented to Plaintiffs and the Class on the lab reports issued by EDLab that the

1  lab was an "AIHA Accredited Lab".

2      92.    These facts were false as alleged above and the true facts were not

3  known to Plaintiffs and the Class at the time of these transactions occurred as

4  described herein.

5      93.    Plaintiffs and the Class reasonably relied upon Defendants'

6  representations.  Defendants knew or ought to have known that Plaintiffs and the

7  Class relied and/or continue to rely upon Defendants' representations.  Defendants'

8  knowledge that EDLab does not possess the proper accreditation to conduct analysis

9  of formaldehyde gas samples, that the Bio-Badge is not the same sampling method

10  used by "professionals" to test indoor air for excessive levels of formaldehyde gas,

11  and that EdLab is not truly "independent" creates a legal obligation on Defendants'

12  part to disclose to Plaintiffs and the Class these facts.  Defendants are in a superior

13  position to know the truth about, and the nature of, the home test kits and testing

14  being conducted by EDLab.

15      94.    Defendants intended and intend to deceive Plaintiffs and the Class by

16  failing to disclose that EDLab does not possess the proper accreditation to conduct

17  analysis of formaldehyde gas samples, that the Bio-Badge is not the same sampling

18  method used by "professionals" to test indoor air for excessive levels of

19  formaldehyde gas, and that EdLab is not truly "independent".

20      95.    Defendants' failure to disclose these facts was material.  Plaintiffs and

21  the Class would not have allowed the Formaldehyde Flooring to remain in their

22  homes had they known of these true facts.

23      96.    Plaintiffs and the Class were harmed.  As a proximate result of

24  Defendants' conduct as set forth in this cause of action, Plaintiffs and the Class will

25  now be required to incur the cost to conduct proper indoor air sampling by a

26  certified industrial hygienist using a sampling method approved by NIOSH or

27  OSHA, and to have those samples analyzed at a laboratory holding an AIHA IHLAP

28  accreditation.

ROBERTSON
& ASSOCIATES, LLP

17971.1

33

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   97.   Defendants' concealment was a substantial factor in causing that harm.

2   98.   The wrongful conduct of Defendants, as alleged herein, was willful,

3   oppressive, immoral, unethical, unscrupulous, substantially injurious, malicious,

4   and/or in conscious disregard for the wellbeing of Plaintiffs and the Class along with

5   other members of the public that may be personally injured by the excessive levels

6   of formaldehyde gas emitted from the Formaldehyde Flooring.  Defendants intended

7   to cause injury to the Plaintiffs and the Class placing profits over safety.  Defendants

8   engaged and continue to engage in despicable conduct with a willful and conscious

9   disregard of the rights or safety of others.  Defendants subjected, and continue to

10   subject, Plaintiffs and the Class to cruel and unjust hardship.  Accordingly, Plaintiffs

11   and Class members are entitled to an award of punitive damages against Defendants

12   in an amount to deter them from similar conduct in the future.

13   ## **PRAYER FOR RELIEF**

14   WHEREFORE, Plaintiffs, on behalf of themselves and all other individuals

15   similarly situated, requests the following relief:

16   A. That the Court determine that this action may be maintained as a class

17   action under Rule 23;

18   B. Injunctive relief prohibiting Defendants from continuing to offer the

19   Bio-Badge home test kit as a method to conduct indoor air sampling for

20   formaldehyde gas, pursuant to California *Business and Professions*

21   *Code* sections 17203 and California *Civil Code* section 1780;

22   C. Injunctive relief prohibiting Defendants from continuing to offer

23   EDLab to conduct indoor air sampling for formaldehyde gas, pursuant

24   to California *Business and Professions Code* sections 17203 and

25   California *Civil Code* section 1780;

26   D. Restitution of all monies Plaintiffs and the class members incur to

27   conduct indoor air sampling from a certified industrial hygienist using a

28   sampling method approved by NIOSH or OSHA, and to have those

ROBERTSON
& ASSOCIATES, LLP

17971.1

34

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

samples analyzed at a lab holding an AIHA IHLAP accreditation, based on violations of California *Business and Professions Code* section 17200;

E. Damages to be determined in at trial including actual, compensatory, and consequential damages incurred by Plaintiffs and class members;

F. An award of reasonable attorneys' fees and costs;

G. Entry of judgment declaring the acts and practices complained of herein to constitute fraud, together with an award of monetary damages and other available relief on those claims;

H. Treble damages and the cost of suit, including attorney's fees, pursuant to 18 U.S.C. §1946(c); and

I. That the Court award such other and further relief as this Court may deem appropriate.

DATED: April 16, 2015          ROBERTSON & ASSOCIATES. LLP

By: _____
ALEXANDER ROBERTSON, IV
Attorneys for Plaintiffs

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and all others similarly situated, hereby requests a jury trial on the claims so triable.

DATED: April 16, 2015          ROBERTSON & ASSOCIATES, LLP

By: _____
ALEXANDER ROBERTSON, IV
Attorneys for Plaintiffs And The Proposed Class

ROBERTSON
& ASSOCIATES, LLP

17971.1

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF